J-A21020-15

## NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| DERRICK ROBINSON | |
| Appellant | No. 2116 EDA 2014 |

Appeal from the Judgment of Sentence July 22, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0011534-2013

BEFORE:  ALLEN, J., MUNDY, J., and FITZGERALD, J.[*]

MEMORANDUM BY MUNDY, J.:          **FILED AUGUST 12, 2015**

Appellant, Derrick Robinson, appeals from the July 22, 2014 judgment

of sentence of two and one-half to five years' imprisonment, followed by five

years' probation, imposed following his convictions for persons not to

possess firearms, firearms not to be carried without a license, and carrying

firearms on public streets in Philadelphia.[1]  After careful review, we affirm.

The trial court has summarized the factual history of this case as

follows.

> On August 28, 2013, at about 12:43 a.m.,
> Philadelphia Police Officer Christopher Clair and his
> partner were on bike patrol when they observed

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 6105, 6106, and 6108, respecetively.

Appellant in the 3900 block of Market Street in Philadelphia. Prior thereto, Officer Clair had contact with [] Appellant at or about 7:45 p.m.[,] while dispersing an unruly crowd engaged in some sort of dispute. Officer Clair recalled that during the earlier encounter, Appellant was more vocal than the other persons involved in the incident, and had been wearing a distinctive orange and blue shirt.

When Officer Clair again saw Appellant in the early morning of the 28th, he and his partner had just received priority radio call to search for a person wearing blue jeans and an orange shirt with blue stripes who, allegedly, was waving a gun in the air. Officer Clair recalled that earlier that evening Appellant had been wearing a shirt that matched the description of the shirt described in the radio call worn by the man waving the gun.

Upon observing Appellant in the early morning hours of August 28th, Appellant was in a courtyard situated behind townhouses near 40th Street. The officers rode to a spot approximately five feet from Appellant and requested that he remove his hands from his pocket. Appellant asked, "Why?" and then said, "No[,]" at which time Officer Clair began dismounting from his bike. As the officer climbed off his bike, Appellant fled northbound through the courtyard. Office Clair pursued Appellant, who was clutching his pocket as he ran.

When Appellant reached Market Street, he turned east and discarded an object over a four[-]foot wall into a yard. Officer Clair testified that the abandoned object made a "clinking" sound when it hit the ground. Appellant was apprehended shortly thereafter at which time Officer Clair and his partner escorted Appellant to the spot where he was observed discarding the object. Once there, Officer Clair's partner located a gun in the yard into which Appellant was observed throwing the object. The officers did not recover the weapon but instead contacted Southwest Detectives who secured the scene and seized the weapon.

> Subsequent testing of the weapon revealed it to be operable. In addition, Appellant did not have a license to carry the weapon and was ineligible to possess a firearm because of a prior felony conviction.

Trial Court Opinion, 11/17/14, at 2-3.

On September 19, 2013, by criminal information, the Commonwealth charged Appellant with the aforementioned offenses as well as possession of a small amount of marijuana.[2] On April 23, 2014, Appellant filed an omnibus pre-trial motion seeking suppression of physical evidence based on, *inter alia*, a lack of reasonable suspicion. Appellant's Omnibus Pre-Trial Motion, 4/23/14, at 1. On May 27, 2014, the trial court held a hearing on Appellant's motion, and at the conclusion of the hearing, denied said motion. N.T., 5/27/14, at 26. Appellant proceeded immediately to a bench trial, and the trial court found him guilty of persons not to possess firearms, firearms not to be carried without a license, and carrying firearms on public streets in Philadelphia. *Id.* at 33. The Commonwealth *nolle prossed* the marijuana charge. *Id.* On July 22, 2014, the trial court sentenced Appellant to two and one-half to five years' imprisonment, followed by five years' probation.[3]

_____

[2] 35 P.S. § 780-113(a)(31).

[3] Specifically, the trial court sentenced Appellant to two and one-half to five years' imprisonment for firearms not to be carried without a license and a consecutive five years' probation for persons not to possess firearms. Trial Court Order, 7/22/14 at 1. The trial court imposed no further penalty on
*(Footnote Continued Next Page)*

- 3 -

No post-sentence motions were filed. Appellant filed a timely notice of appeal on July 23, 2014.[4]

On appeal, Appellant raises the following sole issue for our review.

> Did not the trial court err in denying the motion to suppress physical evidence, insofar as [A]ppellant was stopped without reasonable suspicion and, therefore, any abandonment of physical items was coerced?

Appellant's Brief at 3.

When reviewing a challenge to a trial court's denial of a suppression motion, we adhere to the following well-established standard of review.

> We may consider only the Commonwealth's evidence and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the trial court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. An appellate court, of course, is not bound by the suppression court's conclusions of law.

*Commonwealth v. Gary*, 91 A.3d 102, 106 (Pa. 2014) (citation omitted).

Appellant argues that the initial encounter between Officer Clair and Appellant constituted a seizure, requiring reasonable suspicion, because Officer Clair ordered him to take his hands out of his pockets, and "[w]hen

_(Footnote Continued)_ ———————

Appellant's conviction for carrying firearms on public streets in Philadelphia. *Id.*

[4] Appellant and the trial court have complied with Pennsylvania Rule of Appellate Procedure 1925.

police officers give orders to civilians, it is apt to leave a reasonable person to feel that he is not free to leave or disobey." Appellant's Brief at 8. He further argues the trial court erred in denying his motion to suppress because Appellant was not observed engaging in illegal or suspicious conduct, and "the only justification [to stop Appellant] was an anonymous call implicating someone wearing a shirt the same colors as [Appellant's]." *Id.* The Commonwealth counters that "Appellant's encounter with police … escalated [to an investigative detention] only *after* he ignored Officer Clair's request to take his hands out of his pockets and ran." Commonwealth Brief at 9 (italics in original). For the reasons that follow, we agree with the Commonwealth.

The Fourth Amendment of the United States Constitution guarantees that, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated…." U.S. Const. amend IV. Similarly, the Pennsylvania Constitution assures citizens of our Commonwealth that "[t]he people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures…." Pa. Const. art. I, § 8. Further, "[t]he reasonableness of a governmental intrusion varies with the degree of privacy legitimately expected and the nature of the governmental intrusion." ***Commonwealth v. Fleet***, 114 A.3d 840, 844 (Pa. Super. 2015) (citation omitted).

Interactions between law enforcement and citizens fall into one of the following three categories.

> The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or respond. The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

*Id.* (citation omitted). When assessing whether an interaction escalates from a mere encounter to an investigative detention, we employ the following standard.

> To guide the crucial inquiry as to whether or not a seizure has been effected, the United States Supreme Court has devised an objective test entailing a determination of whether, in view of all surrounding circumstances, a reasonable person would have believed that he was free to leave. In evaluating the circumstances, the focus is directed toward whether, by means of physical force or show of authority, the citizen-subject's movement has in some way been restrained. In making this determination, courts must apply the totality-of-the-circumstances approach, with no single factor dictating the ultimate conclusion as to whether a seizure has occurred.

*Commonwealth v. McAdoo*, 46 A.3d 781, 784 (Pa. Super. 2012) (citation omitted), *appeal denied*, 65 A.3d 413 (Pa. 2013). Moreover, when this Court evaluates whether an investigative detention is constitutional, the following principles guide our decision.

A police officer may detain an individual in order to conduct an investigation if that officer reasonably suspects that the individual is engaging in criminal conduct. This standard, less stringent than probable cause, is commonly known as reasonable suspicion. In order to determine whether the police officer had reasonable suspicion, the totality of the circumstances must be considered. In making this determination, we must give due weight to the specific reasonable inferences the police officer is entitled to draw from the facts in light of his experience. Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

*Commonwealth v. Ranson*, 103 A.3d 73, 76 (Pa. Super. 2014), *appeal denied*, --- A.3d ---, 2015 WL 3938036 (Pa. 2015), *citing* **Commonwealth v. Foglia**, 979 A.2d 357, 360 (Pa. Super. 2009) (*en banc*), *appeal denied*, 990 A.2d 727 (Pa. 2010).

At the suppression hearing, the only evidence proffered by the Commonwealth was the testimony of Officer Clair, and Appellant did not submit any evidence. Officer Clair testified that he had been a Philadelphia police officer for approximately 17 years, during which time he has made hundreds of arrests. N.T., 5/27/14, at 7. His testimony further established that the area where he encountered Appellant is known for drug activity and shootings. *Id.* He testified, specifically regarding his interactions with Appellant, as follows.

[The Commonwealth]:

Q. [W]hy were you there patrolling that day?

[Officer Clair]:

A. Well, that day we were specifically in that area … for an occurring rash of armed robbery, point of gun.

Q. [On August 27, 2013], did you actually go to that location earlier that day?

A. Earlier that day during our routine patrol in that area, I did have an interaction with [Appellant]. There was a disorderly crowd that were yelling at each other. We dispersed the crowd and gave them warnings, and I actually wrote the paperwork on it.

Q. And after that incident, did everybody disperse?

A. At that time, yes, they did.

Q. Okay. That was approximately 7:45 p.m.; is that right?

A. That is correct.

Q. [Y]ou ended up going back to the location at approximately 12:43 [a.m.]; is that right?

A. I did, yes.

Q. All right. Why did you go back there?

A. We were surveying the area for a person with a gun, and that person with the gun was wearing an orange shirt with blue stripes on it. I do recall from earlier in the night, five hours prior to the incident in which I had the interaction with [Appellant], that he was wearing an orange shirt with blue stripes on it. Actually, Your Honor, he's wearing that same shirt right now.

…

Q. Now, when you went to that location and saw this [Appellant], what happened then?

…

[The Commonwealth]: Oh. Let the record reflect that [Appellant] is actually wearing the same orange and blue-striped shirt.

[The trial court]: So noted.

…

A. At that time[,] I observed the male in the courtyard. … It's three different courtyards, I believe [describing the area Appellant was observed].

So in the first courtyard closest to 40th Street, I, along with my partner, [], we're on bikes. I approached this male, he has his hands in his pocket, Your Honor. I asked him to remove his hands from his pocket, at which time I believe he said "why" and "no." So I was getting off my bike. As I was getting off my bike, he ran northbound through the courtyard. I mounted my bike and gave pursuit following him approximately ten feet behind him the whole entire time while my partner went down a small driveway, which would be mirroring me.

So [Appellant] makes the right--he makes a right again on foot going eastbound all along the 3900 block of Market Street. The whole entire time, as I'm on my bike, with his right hand he's clinching his pocket. At one point[,] he pulls out an unknown black object and he discards it behind two of the townhouses into the common yard area over a small wall. … I hear a clinking sound like metal on metal. Continued to pursue the male to the front of that property, which is another courtyard. … [M]y partner meets [Appellant] in the front as I get him from behind.

- 9 -

At that point[,] we immediately take him into custody, and I walk him back onto 3900 Market Street. And I observed in my presence, my partner went immediately into … where I heard the clinking sound, which was later identified as a gun, in my presence he recovered, but, yet, did not touch and contacted Southwest Detectives for them to recover it.

Q. Officer, you said he was holding his pocket as he was running. Was that the same pocket his hand was in when you were outside?

A. Outside, yeah. Initially, he had his hands in both pockets, Your Honor, and he refused to take them out.

Q. [D]id you talk to him multiple times or you just talked to him that one time?

A. I initially gave him the order to remove his hands for my safety, unaware if he had any weapons. As soon as he said, "why" and "no," and I dismounted my bike, he took off, Your Honor.

*Id.* at 7-11.

In *Commonwealth v. Coleman*, 19 A.3d 1111 (Pa. Super. 2011), this Court analyzed the nature of a police-citizen encounter under similar circumstances. In *Coleman*, a police officer responded to a report of a robbery in progress by two black males wearing green, hooded jackets under black coats. *Coleman*, *supra* at 1114. The radio call indicated the suspects had a gun and knife. *Id.* The officer observed the appellant, who was a black male and fit the clothing description, and asked if he had a gun. *Id.* The appellant responded that he did not have a gun, but he was observed by the officer "fumbling" with his hands in his pocket. *Id.* The

- 10 -

officer then asked the appellant to raise his hands, but the appellant would not comply and continued to keep his hands in his pockets. *Id.* When the appellant failed to comply with the officer's request, the officer then brought the appellant to his police van, while appellant resisted, and a struggle ensued. *Id.*

In concluding the initial interaction between the appellant and police officer was a mere encounter, this Court noted that, "[b]oth the United States and Pennsylvania Supreme Courts have held that both the approach of a police officer followed by questioning does not constitute a seizure." *Id.* at 1116 (citations omitted). We further concluded, "the fact that [the police officer] told [the a]ppellant to take his hands out of his pockets did not turn the encounter into a seizure." *Id.* at 1117. Therefore, the seizure of the appellant in that case did not occur until the police officer tried to move the appellant to the police car. *Id.*

Herein, the evidence establishes that when Officer Clair first approached Appellant, he asked Appellant to remove his hands for safety. N.T., 5/27/14, at 11. Upon Appellant's refusal, Officer Clair dismounted his bike, and Appellant fled. *Id.* Under the totality of the circumstances, at this point, we conclude Appellant was not subjected to an investigative detention, but was engaged in a mere encounter with Officer Clair. *See* *McAdoo*, *supra*; *Coleman*, *supra*.

Following this brief encounter where Appellant refused to remove his hands from his pockets, Appellant fled, and Officer Clair pursued. N.T., 5/27/14, at 9. Therefore, at this point, a seizure occurred. *See Ranson*, *supra* at 77 (observing "pursuit by police constitutes a seizure under the law of this Commonwealth"). However, the uncontradicted evidence at the suppression hearing established that at the time of the police pursuit of Appellant, he was present in an area known for drug and gun activity at approximately 12:43 a.m., he matched the distinctive clothing description of a report of someone waving a gun, he had refused to remove his hands from his pockets, and he fled in response to police presence. N.T., 5/27/14, at 7-9. Further, while fleeing, Appellant was "clinching his pocket area." *Id.* at 12. Under the totality of the circumstances, upon Appellant's flight, we conclude there was reasonable suspicion to believe Appellant was engaged in criminal conduct. *See Ranson, supra*; *see also In re D.M.*, 781 A.2d 1161, 1164 (Pa. 2001) (discussing the relevancy of flight in determining if reasonable suspicion exists and noting, "it is evident that unprovoked flight in a high crime area is sufficient to justify a *Terry*[5] stop under the Fourth Amendment[]"); *cf. Commonwealth v. Washington*, 51 A.3d 895, 898-899 (Pa. Super. 2012) (reviewing cases where the defendants "clearly … fled from individuals who were recognized as police" and concluding the "crucial

_____

[5] *Terry v. Ohio*, 392 U.S. 1 (1968).

element" when evaluating flight in a high crime area creating a nexus between running and criminal activity is that the defendant was "knowingly running from police[]").

Accordingly, we reject both Appellant's argument that when Officer Clair first approached Appellant, he was subjected to an investigative detention without reasonable suspicion and Appellant's argument that Officer Clair's **only** justification for stopping Appellant was an "anonymous radio call." Appellant's Brief at 8. The totality of the circumstances demonstrate that the police officers had reasonable suspicion to believe Appellant was engaged in criminal activity when they began their pursuit of Appellant, and we conclude the trial court did not err in denying Appellant's motion to suppress. *See Ranson*, *supra*. Therefore, we affirm the July 22, 2014 judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/12/2015